RECORD NO. 14-1396

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

MEDICAL MUTUAL INSURANCE COMPANY
OF NORTH CAROLINA,

*Plaintiff-Appellant,*

v.

IMAGE GUIDED PAIN MANAGEMENT, P.C.,
JOHN MILLIGAN MATHIAS, M.D.,
and ROBERT FRANCIS O'BRIEN, M.D.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

**OPENING BRIEF OF APPELLANT
MEDICAL MUTUAL INSURANCE COMPANY
OF NORTH CAROLINA**

Danny M. Howell
Michael T. Marr
Sarah A. Bucovetsky
SANDS ANDERSON PC
1497 Chain Bridge Road, Suite 202
McLean, Virginia 22101
(703) 893-3600
(703) 893-8484 (fax)

*Counsel for Appellant
Medical Mutual Insurance Company
of North Carolina*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1396__        Caption: __Medical Mutual Ins. Co. of North Carolina v. Image Guided Pain Mgmt.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Medical Mutual Insurance Company of North Carolina__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                       ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Danny M. Howell  Date: May 8, 2014

Counsel for: Appellant

## CERTIFICATE OF SERVICE
****************************

I certify that on _____5/8/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mark D. Loftis, Esq.
Frank K. Friedman, Esq.
Woods Rogers, PLC
10 S. Jefferson Street
Suite 1400
P O Box 14125
Roanoke, VA  24038

/s/Danny M. Howell                                5/8/2014
(signature)                                        (date)

- 2 -

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF THE CASE.............................................................2

STATEMENT OF FACTS ..................................................................6

    Factual Allegations of the Complaints Allege Negligence and Negligence *Per Se* Based on Violations of the DCA .......................................6

    Virtually Every Pleaded Fact in the Underlying Complaints Alleges a Violation of the Virginia DCA ..................................................10

        Table 1.  Comparison of the Facts Alleged and the Provisions of the DCA...............................................................11

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT ...................................................................................21

I.      STANDARD OF REVIEW.......................................................21

II.     COVERAGE IS NOT AFFORDED UNDER THE "POSTENITALITY RULE" .....................................................21

    A.      Introduction........................................................................21

    B.      The Phrase "Arising Out Of" Is Interpreted Broadly To Apply Whenever The Damage Alleged to Flow From A Non-Excluded Activity Would Not Have Occurred But For The Excluded Act........28

    C.      The Phrase "In Connection With" Is Interpreted Even More Broadly Than The Phrase "Arising Out Of", And Is Held To Mean "Related To", "Linked To", Or "Associated With"...........................................32

    D.      The Negligence Counts Are Based On, Arise Out Of, And Are "In Connection With" The Anti-Adulteration Statutory Violations, Where

They Implicate Those Statutory Violations As The Basis For The Relief Sought ........................................................................................35

E. Allegations Of Negligence That Are "Inextricably Intertwined" With Excluded Claims Necessarily "Arise Out Of" And Are "In Connection With" The Exclusion ..........................................................................40

F. Allegations That Methylprednisolone Was Used "Off Label" Or That "Informed Consent" Was Not Obtained For The "Method Of Treatment", Do Not Trigger The Duty To Defend, Where The Only Injury Alleged Is Illness Due To The Use Of Adulterated, Fungus-Contaminated Steroids In Violation of The DCA ..............................44

G. The Fourth Circuit Has Rejected The Argument That The Duty To Defend Is Triggered By Allegations Of Negligence "Picked Out" Of The Complaint, Where Each Cause Of Action Is Predicated On Excluded Conduct, In The Absence Of Which There Would Be No Injury Upon Which To Base An Award Of Damages ........................49

III. COMPLAINTS ALLEGING BREACH OF WARRANTY AS WELL AS DRUG CONTROL ACT VIOLATIONS ARE ALSO EXCLUDED FROM COVERAGE BY THE WARRANTY EXCLUSION ................................53

CONCLUSION AND RELIEF SOUGHT ..............................................55

REQUEST FOR ORAL ARGUMENT ...................................................55

# TABLE OF AUTHORITIES

## CASES:

Acadia Ins. Co. v. Vermont Mut. Ins. Co., 2003 Me. Super. LEXIS 260, at *1-2 (Me. Super. Ct. Aug. 18, 2003)............................................................34

Allstate Ins. Co. v. Moraca, 244 N.J. Super. 5, 17-18, 581 A.2d 510, 517-18 (N.J. Ct. App. 1990)............................................................................41

American Family Mut. Ins. Co. v. Corrigan, 697 N.W.2d 108, 114 (Iowa 2005) ..47

Barnhill v. Veneman (In re Peanut Crop Ins. Litig.), 524 F.3d 458, 470 (4th Cir. 2008) ............................................................................................21

Bendis v. Federal Ins. Co., 958 F.2d 960, 963 (10th Cir. 1991), affirming the district court's decision at 1989 U.S. Dist. LEXIS 15930 (D. Kan. Dec. 1, 1989) .....
............................................................................................37, 39

Beretta, U.S.A., Corp. v. Federal Ins. Co., 117 F. Supp. 2d 489, 493-94 (D. Md. 2000) ............................................................................................29

Bertagnolli v. Association of Trial Lawyers Assur., 934 P.2d 916, 919 (Colo. Ct. App. 1997) ............................................................................43

Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co., 220 F.3d 1, 7 (1st Cir. 2000) ............................................................................30

CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009) ............................................................................................50

Cameron Mut. Ins. Co. v. Skidmore, 633 S.W.2d 752, 753 (Mo. Ct. App. 1982)..34

Camico Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP, 2013 U.S. Dist. LEXIS 91649, at *25 (E.D. Pa. June 27, 2013) ...................................................33

Celotex Corp. v. AIU Ins. Co., 149 B.R. 997, 1001 (Bankr. M.D. Fla. 1993)........44

Cincinnati Ins. Co. v. William F. Braun Milk Hauling, Inc., 2013 U.S. Dist. LEXIS 150665, at *8-9 (S.D. Ill. Oct. 21, 2013) ............................................47, 51

Clinch v. Generali-U.S. Branch, 110 Conn. App. 29, 39, 954 A.2d 223, 230 (Conn. Ct. App. 2008), aff'd, adopted by 293 Conn. 774, 980 A.2d 313 (2009) ..........43, 48

Continental Cas. Co. v. Richmond, 763 F.2d 1076, 1080 (9th Cir. 1985) ..............32

Coregis Ins. Co. v. American Health Found., 241 F.3d 123, 128-29 (2d Cir. 2001) .. ..........................................................................................................................33

EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 438 F.3d 519, 524 (5th Cir. 2006) ......................................................................................................31

Empire HealthChoice Assur. Inc. v. McVeigh, 396 F.3d 136, 157 (2d Cir. 2005).33

Evanston Ins. Co. v. Bulkley, 2005 U.S. Dist. LEXIS 22507 (D.N.J. Sept. 23, 2005) .....................................................................................38, 39, 48, 52

Evanston Ins. Co. v. Harbor Walk Dev., LLC, 814 F. Supp. 2d 635, 654 (E.D. Va. 2011) aff'd, Evanston Ins. Co. v. Germano, 514 Fed. Appx. 362 (4th Cir. Mar. 20, 2103) ...............................................................................................52

Farmers Tex. Co. Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 82 (Tex. 1997)...........32

Gemini Ins. Co. v. Trident Roofing Co., 2010 U.S. Dist. LEXIS 5457, at *8 (N.D. Tex. Jan. 22, 2010)..................................................................................29

Great Divide Ins. Co. v. Midnight Rodeo, Inc., 2010 U.S. Dist. LEXIS 51598, at *14-15 (E.D.N.C. May 24, 2010) ........................................................................41

Hartford Accident & Indemnity Co. v. Civil Service Employees Insurance Co., 33 Cal. App. 3d 26, 108 Cal. Rptr. 737 (Cal. Ct. App. 1973) ......................................32

Headley-Ombler v. Holder, 2013 U.S. Dist. LEXIS 171699, at *20 (E.D.N.Y. Dec. 5, 2013) ...............................................................................................33

Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 512 (4th Cir. 1994).......21

Jackson v. Lajaunie, 270 So. 2d 859, 864 (La. 1972).............................................33

Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 13 (Tex. 2007).....32

iv

Lancia v. State Nat'l Ins. Co., 134 Conn. App. 682, 698 (Conn. Ct. App. 2012)....43

Marvin J. Perry, Inc. v. Hartford Cas. Ins. Co., 412 Fed. Appx. 607, 614 (4th Cir. 2011) ........................................................................................................48

Metropolitan Property and Cas. Ins. Co. v. Fitchburg Mut. Ins. Co., 793 N.E.2d 1252, 1255 (Mass. Ct. App. 2003)..........................................................34

Minnesota Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP, 472 Fed. Appx. 219, 224 (4th Cir. 2012)..........................................24, 49, 52

Morgan v. Utica Mut. Ins. Co., 2000 U.S. App. LEXIS 22710, at *9-10 (6th Cir. Aug. 30, 2000) ......................................................................................42

National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co., 162 F.3d 821, 824 (4th Cir. 1998) ........................................................................................21

National Union Fire Ins. Co. v. U.S. Liquids, Inc., 88 Fed. Appx. 725, 730 (5th Cir. 2004) ..........................................................................................40

Nationwide Mut. Fire Ins. Co. v. Nunn, 442 S.E.2d 340 (N.C. Ct. App. 1994) .....34

Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F. Supp. 2d 502, 533 (E.D. Va. 2011) ..................................................................................25, 50, 52

Nautilus Ins. Co. v. 1452-4 N. Milwaukee Ave., LLC, 562 F.3d 818, 821-23 (7th Cir. 2009) ..........................................................................41, 47, 48

Northbrook Prop. & Cas. Co. v. Transp. Joint Agreement, 194 Ill. 2d 96, 99, 741 N.E. 2d 253, 254-55 (Ill. 2000)..........................................................51

Old Republic Ins. Co. v. Comprehensive Health Care Assocs., Inc., 2 F.3d 105, 109 (5th Cir. 1993)..............................................................................44

Parameter Driven Software, Inc. v. Mass. Bay Ins. Co., 25 F.3d 332, 337 (6th Cir. 1994) ........................................................................................48

Phoenix Leasing Inc. v. Sure Broad., Inc., 843 F. Supp. 1379, 1388 (D. Nev. 1994), aff'd, 89 F.3d 846 (9th Cir. 1996)................................................33

Prot. Strategies, Inc. v. Starr Indem. & Liab. Co., 2014 U.S. Dist. LEXIS 56652, at *28-29 (E.D. Va. Apr. 23, 2014) ...........................................................49

Red Ball Motor Freight v. Employers Mutual Liability Ins. Co., 189 F.2d 374, 378 (5th Cir. 1951).................................................................................29, 31

Rizzo v. Schiller, 248 Va. 155, 158-59 (1994).......................................................30

Robinson v. Hudson Speciality Ins. Group, 2013 U.S. Dist. LEXIS 151403, at *18 (S.D. Ala. Oct. 22, 2013) ...........................................................................42

Salomon v. Phila. Ins. Cos., 2014 U.S. Dist. LEXIS 8334, at *25-26 (D. Mass. Jan. 23, 2014) .............................................................................................37, 39

Scottsdale Ins. Co. v. Mt. Hawley Ins. Co., 2011 U.S. Dist. LEXIS 156386, at *16-17 (S.D. Tex. June 15, 2011), aff'd, 488 Fed. Appx. 859 (5th Cir. Sept. 14, 2012)........................................................................................................31

Scottsdale Ins. Co. v. Tex. Sec. Concepts & Investigation, 173 F.3d 941, 943 (5th Cir. 1999) .............................................................................................31

Sport Supply Group, Inc. v. Columbia Cas. Co., 335 F.3d 453, 458 (5th Cir. 2003) ..............................................................................................................31

St. Paul Fire and Marine Insurance Co. v. Insurance Company of North America, 501 F. Supp 136, 138 (W.D. Va. 1980) ..................................................29

Stafford v. Scottsdale Ins. Co., 416 Fed. Appx. 191, 195 (3d Cir. 2010) ...............44

State Auto Mut. Ins. Co. v. Lucchesi, 2012 U.S. Dist. LEXIS 77733, at *13 (M.D. Pa. Jun. 5, 2012)......................................................................................42

Stevens v. Fireman's Fund Ins. Co., 375 F.3d 464, 467 (6th Cir. 2004) ................44

Superformance Int'l, Inc. v. Hartford Cas. Ins. Co., 332 F.3d 215, 223 (4th Cir. 2003) ...........................................................................................................46

Trex Co. v. Exxonmobil Oil Corp., 234 F. Supp. 2d 572, 576 (E.D. Va. 2002).....29

United States v. Loney, 219 F.3d 281, 284 (3d Cir. 2000)......................................35

United States v. Thompson, 32 F.3d 1, 7 (1st Cir. 1994) .........................................35

United States v. Wyatt, 102 F.3d 241, 247 (7th Cir. 1996) ....................................35

Va. Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co., 252 Va. 265, 475 S.E.2d 264, 265 (Va. 1996)................................................................................50, 51

Westfield Ins. Co. v. Hill, 790 F. Supp. 2d 855, 868 (N.D. Ind. 2011)...................44

Wilkins v. American Motorists Ins. Co., 97 N.C. App. 266, 271-72, 388 S.E. 2d 191, 192-93 (N.C. Ct. App. 1990) .........................................................................32

## STATUTES

28 U.S.C. § 551 et seq.............................................................................................1, 14

28 U.S.C. §1291 ...........................................................................................................1

Virginia Code § 54.1-4310.2(E) ........................................................................17, 36

Virginia Code § 54.1-3410.2(H)(2) ...................................................................17, 36

Virginia Code § 54.1-3435.01(A)....................................................................passim

Virginia Code § 54.1-3457(1), (2), (3), (7) and (10) ......................................passim

Virginia Code § 54.1-3461(A)(2) .........................................................11, 12, 13, 14

Virginia Code § 54.1-3461(B) ...........................................................................11, 13

Virginia Code § 3457.....................................................................................................8

Virginia Code § 3458.....................................................................................................8

Virginia's Drug Control Act, Virginia Code § 54.1-3400 et seq. ....................passim

**RULES**

Fed. R. Civ. 12(b)(6) ..........................................................................*passim*

**OTHER AUTHORITIES**

Webster's Dictionary ...............................................................................33

Webster's Third New International Dictionary .......................................33

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action for declaratory relief, brought under the Declaratory Judgment Act, 28 U.S.C. § 551 et seq., and seeking a declaration that Medical Mutual Insurance Company of North Carolina ("Medical Mutual") (a North Carolina corporation) did not have a duty to defend Image Guided Therapeutics, PC ("Image Guided"), John Milligan Mathis, M.D. ("Mathis"), and Robert Francis O'Brien, M.D. ("O'Brien") (collectively, "Defendants") (all Virginia residents).

The Court of Appeals for the Fourth Circuit has appellate jurisdiction pursuant to 28 U.S.C. §1291 which grants appellate review of final decisions of district courts of the United States.

Counsel certifies that the instant appeal arises from a final decision of the District Court. The District Court entered an Order of Court, dated April 21, 2014, granting the Defendants' Motion to Dismiss the Complaint pursuant to Fed. R. Civ. 12(b)(6). Joint Appendix ("J.A.") at 929, dkt. 20. The Notice of Appeal was filed on April 23, 2014. J.A. at 930, dkt. 21.

## STATEMENT OF THE ISSUES

1.     Did the District Court err as a matter of law in deciding that Medical Mutual owed a duty of defense, where damage claims based on alleged negligence

1

were inextricably intertwined with damage claims excluded from coverage under broadly worded exclusions in the insurance policy?

2.      Did the District Court err as a matter of law in deciding that Medical Mutual owed a duty of defense, where damage claims based on alleged negligence arose from or were in connection with damages excluded from coverage under broadly worded exclusions in the insurance policy?

3.      Did the District Court err as a matter of law in deciding that Medical Mutual owed a duty of defense, where damage claims based on alleged negligence were identical to damages excluded from coverage under the terms of the insurance policy?

4.      Did the District Court err as a matter of law in deciding that Medical Mutual owed a duty of defense based on allegations of "off label" use, where the underlying complaints' claim for damages based on "off label" use are the same as the damages excluded from coverage under the terms of the insurance policy?

## STATEMENT OF THE CASE

Medical Mutual issued a Medical Professional Liability Non-Assessable Claims Made Policy, Policy No. PG116945 (the "Policy") to Image Guided for the policy period of March 1, 2012 to March 1, 2013.[1]  Among other exclusions, the

---

[1]      A copy of the Policy is attached as Exhibit 1 to Medical Mutual's Complaint, J.A. at 18-47.

Policy excludes from coverage "damages arising out of or in connection with . . . an Insured's violation of any statute . . . that provides for any criminal penalty whether or not there is a criminal charge, prosecution, or conviction," and "damages arising out of or in connection with . . . warranting (express or implied) or solicitation of Professional Services[.]"

Medical Mutual brought a declaratory judgment action seeking a determination as to whether it owed a duty of defense to its insureds Image Guided, Mathis, and O'Brien in connection with numerous suits alleging injuries from injections with adulterated, fungus-contaminated steroids. Medical Mutual is defending these suits under a reservation of rights.

The suits being defended by Medical Mutual fall into two groups. While each suit alleges injuries arising from injections of contaminated methylprednisolone acetate ("methylprednisolone"), virtually all of the lawsuits primarily seek damages for negligence *per se* based on violations of Virginia's Drug Control Act ("DCA"), a statute carrying criminal penalties.

As to these suits, Medical Mutual alleged that there was no potentiality of coverage, and therefore, no duty to defend the suits because all of the claims therein fell within Exclusion IV(j) of the Policy, for "damages arising out of or in connection with . . . an Insured's violation of any statute . . . that provides for any

criminal penalty whether or not there is a criminal charge, prosecution, or conviction", since the statute allegedly violated "provides for [a] criminal penalty".

As to the remaining suits, Medical Mutual alleged that there was no potentiality of coverage, and therefore no duty to defend, because all of the claims therein fell within Exclusion IV(c) of the Policy, for "damages arising out of or in connection with . . . warranting (express or implied) or solicitation of Professional Services."

Medical Mutual asserted below that for the underlying complaints asserting violations of the DCA, the phrases "arising out of" and "in connection with" in Exclusion IV(j) were to be interpreted broadly so as to preclude coverage for the entire lawsuit, notwithstanding that certain allegations were also sought under a count labeled "negligence". Medical Mutual asserted that the negligence claims in these underlying complaints were inextricably intertwined with the causes of action for negligence *per se* based on violations of the DCA, alleged the same resulting harm (injury due to sale and use of adulterated, fungus-contaminated steroids), sought the same damages, and alleged essentially the same facts, and therefore necessarily "arose from" or were "in connection with" the excluded conduct.

Four additional underlying complaints allege breaches of express and implied warranties that the steroids were safe (one also alleges negligence *per se*

4

based upon the same panoply of DCA violations as the first group of lawsuits). Medical Mutual asserted below that the policy's exclusion for "damages arising out of or in connection with" the "warranting (express or implied) or solicitation of Professional Services" excluded damages sought pursuant to negligence claims which sought the same damages as, were inextricably intertwined with, alleged the same resulting harm as, and alleged essentially the same facts as, the breach-of-warranty-based claims, and thus necessarily "arose out of" or were "in connection with" the excluded conduct.

The Defendants brought a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Defendants' motion asked the District Court to read the complaints narrowly, looking at the single Count in each that alleged negligence isolated from the other counts in the complaints, and argued that because a single count asserted negligence, that was all that was necessary to trigger the duty to defend, and no further inquiry into the complaints or the language of the policies was necessary. The District Court agreed with defendants, holding that the complaints, which alleged only damage from adulterated steroids caused by criminal violations of the DCA (or by breaches of warranties as to the safety of the drugs), also alleged failure to obtain the patients' informed consent before giving them the adulterated steroids. **In its opinion, the District Court acknowledged the alleged negligence "may be inextricably intertwined" with the allegations in support**

5

**of the excluded damages**, but made no inquiry into, offered no analysis of, and discussed no case authority as to why negligence claims that asserted no separate damages but were inextricably intertwined with the allegations of excluded activity did not constitute claims "arising out of" or "in connection with" the excluded claims.

## STATEMENT OF FACTS

### Factual Allegations of the Complaints Allege Negligence and Negligence *Per Se* Based on Violations of the DCA.

Medical Mutual issued the Policy to Image Guided for the policy period of March 1, 2012 to March 1, 2013.[2]  Mathis and O'Brien are listed on the Policy's Declarations Page as individual insureds under Coverage A of the Policy.

The Policy provides in relevant part:

**IV.  EXCLUSIONS**

**This insurance does not apply to any of the following:**

* * *

(c)  damages arising out of or in connection with . . . warranting (express or implied) or solicitation of Professional Services;

(d)  damages arising out of or in connection with any unfair or deceptive act or practice . . . .

* * *

---

[2]  <u>See</u> footnote 1.

(j)     damages arising out of or in connection with . . . an Insured's violation of any statute . . . that provides for any criminal penalty whether or not there is a criminal charge, prosecution, or conviction.

(k)     damages arising out of or in connection with any willful, fraudulent . . . or intentional acts or omissions . . . ;

* * *

**"Professional Services"** means:

(a)     services requiring the use or application of special learning or intellectual skill performed, or which should have been performed by, an **Insured** in furtherance of medical or surgical treatment or care of patients . . . .

J.A. at 22-25.

Image Guided is named as a defendant in two groups of lawsuits seeking damages for injuries arising from injections of contaminated methylprednisolone. Mathis and/or O'Brien are named as codefendants in most of the suits. Complaint, J.A. at 9, ¶ 9. To date, Medical Mutual has been defending Image Guided in all of the above lawsuits under a reservation of rights. Complaint, J.A. at 12, ¶ 21.

One group of complaints ("Group A") alleges causes of action for negligence *per se* based on asserted violations of the DCA, for negligence specifically based on alleged breaches of duties to insure that drugs the defendants purchased and provided to the plaintiffs were made and sold in compliance with the DCA, for gross negligence in connection with the same conduct, and for fraud for falsely representing to patients that they were receiving a particular brand of

7

drug rather than a "knock off" drug. These complaints also assert causes of action for willful violations of the Virginia Consumer Protection Act. Complaint, J.A. at 9, ¶ 10.

The allegations of the Complaints in Group A include the following:

a. New England Compounding Pharmacy, Inc. ("NECC") was a compounding facility that produced methylprednisolone a "knock off" drug of Depo-Mendrol;

b. Image Guided, trading under the fictitious name of Insight Imaging-Roanoke, purchased methylprednisolone from NECC;

c. NECC was an unaccredited pharmacy that did not properly sterilize the drugs, and that violated multiple Virginia statutes regarding adulterated drugs;

d. Image Guided and its employees and agents (including, in complaints in which they were named, Mathis and O'Brien) engaged in conduct violative of the DCA, including offering for sale an adulterated drug; receiving and delivering an adulterated drug; and false representations in violation of the DCA; and

e. The "knock off" drug was contaminated by mold, fungus, and/or other contaminants.

Complaint, J.A. at 9-10, ¶ 11.

The Complaints in Group A assert causes of action for negligence *per se* based on asserted violations of the DCA, Virginia Code § 54.1-3400 et seq., specifically violations of § 3457 for offering and delivering an adulterated drug to Image Guided's patients (violations of which are prosecutable as criminal misdemeanors under Virginia Code § 3458), for negligence specifically based on

8

alleged breaches of duties to insure that drugs the defendants purchased and provided to the plaintiffs were made and sold in compliance with the DCA, for gross negligence in connection with the same conduct, for fraud for falsely representing to patients that Depo-Mendrol was being used rather than a "knock off" drug, and for willful violations of the Virginia Consumer Protection Act based on various alleged misrepresentations as to methylprednisolone.[3]   Complaint, J.A. at 10, ¶ 13.

The Complaints in Group B also allege that defendant NECC manufactured a steroid, methylprednisolone, an amount of which became contaminated by a fungus which could cause fungal meningitis, and that NECC supplied contaminated methylprednisolone to Image Guided.  Complaint, J.A. at 7, ¶ 16. The Complaints in Group B further allege that each of the plaintiffs received injections of contaminated methylprednisolone at a facility operated by Insight, and thereafter developed symptoms of fungal meningitis.  Complaint, J.A. at 7, ¶ 17.

As to Image Guided, the Complaints in Group B assert causes of action for negligence in purchasing steroids it ought to have known were unsafe and unsafely manufactured, and for breaches of express and implied warranties as to the safety

---

[3]   Defendants' Motion did not address the applicability of separate exclusions under the Policy for the underlying complaints' assertions of causes of action for fraud and Virginia Consumer Protection Act violations.

of the drugs.  One of the Group B complaints also alleges negligence *per se* based on violations of the DCA, and fraud.  Complaint, J.A. at 11, ¶ 18.

**Virtually Every Pleaded Fact in the Underlying Complaints
Alleges a Violation of the DCA.**

The underling complaints that allege negligence *per se* based on violations of the DCA essentially allege nothing else, notwithstanding that they also assert common law negligence.

Thus, each and every factual allegation in support of Count III (common law negligence) in the underlying complaints corresponds to a specific prohibition under the DCA.  Likewise, the damages claimed in every allegation in the negligence count and every subdivision of the negligence claim spring from and are identical to those damages allegedly caused by the DCA violations - a fungal infection from the injection of the adulterated, fungus-contaminated steroids.

Using the first complaint attached to Medical Mutual's Complaint (the "Artis" Complaint) (all of the suits alleging negligence and negligence *per se* contain identical allegations of fact and damages), the factual allegations and corresponding DCA provisions are as follows (all "Paragraph" references are to the paragraphs of the Artis Complaint alleging common law negligence and all "Section" references are to the specific DCA sections of the Virginia Code):[4]

---

[4]    The Artis Complaint can be found at J.A. at 49-93.

**Table 1.  Comparison of the Facts Alleged and the Provisions of the DCA.**

| | |
|---|---|
| Defendants purchased adulterated drugs manufactured without "proper quality control, safety, and sterility measures" in order to sell and administer these drugs to patients, J.A. at 74, ¶ 197. | Section 54.1-3457(1) prohibits the sale and delivery of "adulterated" drugs, as defined in part at § 54.1-3461(A)(2) as having "been produced, prepared, packed or held under insanitary conditions" causing the drug to become contaminated or "rendered injurious to health." Defendants are alleged to have performed this very conduct by injecting patients with cheap methylprednisolone manufactured in insanitary conditions, in direct conflict with the requirements of the DCA. |
| Defendants failed to "adequately inform" treating physicians that they had purchased unsafe, contaminated drugs from the NECC, thus preventing treating physicians from "making knowledgeable and professionally reasonable decisions to reject" the contaminated drugs, J.A. at 74, ¶ 198. | Sections 54.1-3457(3), (7), and (10) of the DCA expressly prevent receiving adulterated drugs and giving a false guarantee or making a false representation regarding the identification of the drugs.<br><br>An "adulterated" drug itself is further defined by the DCA in Section 54.1-3461(B) as a drug purporting to be under a name that is "recognized in an official compendium" but that the drug itself falls below the compendium's standards.  The failure to "adequately" inform physicians directly refers to the factual allegations that the physicians were not told that the drugs they were injecting were obtained in violation of the DCA, and instead, were told that drugs they were injecting was a recognized FDA-approved and FDA-regulated version of methylprednisolone (see J.A. at 72, ¶ 181). |

| | |
|---|---|
| Defendants failed to appoint a formal medical director, delegated the choosing of "safe drugs" to non-medical staff, J.A. at 75, ¶ 199. | By delegating drug decisions to non-medical personnel, the staff selected unsafe, adulterated drugs, produced in insanitary conditions as designated in Section 54.1-3461(A)(2) of the DCA, culminating in the delivery of these contaminated drugs via injections to patients, in violation of Sections 54.1-3457(1) and (3), prohibiting the sale and delivery of any drug that is adulterated or misbranded. |
| Defendants should have used reasonable care to "avoid injecting" patients with "adulterated drugs".  J.A. at 75, ¶ 200. | Sections 54.1-3457(1) and (3) of the DCA prohibit the receipt and delivery of adulterated drugs "for pay or otherwise". By not using care to "avoid" injecting patients with "adulterated drugs", instead, defendants did the opposite - **affirmatively injected patients with adulterated drugs**, in direct violation of the DCA. |
| Defendants had a duty to "avoid injecting" patients with "adulterated drugs", J.A. at 75, ¶ 201. | By not "avoid[ing]" injecting patients with "adulterated drugs", instead, defendants affirmatively injected patients with adulterated drugs in direct violation of Sections 54.1-3457(1) and (3) of the DCA, prohibiting the receipt and delivery of adulterated drugs" for pay or otherwise". |
| Defendants had a duty to provide reasonable care and treatment, in that defendants were not to inject patients with fungus-contaminated drugs, J.A. at 75, ¶ 202. | Defendants failed to ensure that the drug the defendants were injecting was not adulterated with contaminants, instead, delivering the fungus-laced drug to patients in direct violation of Sections 54.1-3457(1) and (3), which prohibits the sale and delivery of any drug that is adulterated. |
| Defendants failed to properly obtain informed consent for the "nature of the | Sections 54.1-3457(1) and (3) expressly prohibit  the  sale  and  delivery  of  an |

| | |
|---|---|
| procedure" and "risks" associated with defendants providing injections of adulterated and contaminated drugs, J.A. at 75, ¶ 203. | adulterated drug to patients, created in insanitary conditions as set forth in Section 54.1-3461(A)(2) and produced an unregistered and unlicensed facility as required by Section 54.1-3435.01(A) as defendants are alleged to have done when providing these injections. Defendants failed to inform patients of the "risks" of an injection of a drug procured in violation of the DCA, because instead, defendants represented to patients that the drugs they received were an FDA-approved, brand-name drug (see J.A. at 72, ¶ 181), in direct violation of Sections 54.1-3457(2), (7), and (10) of the DCA, prohibiting falsely representing the identification or misbranding an adulterated drug. |
| Defendants failed to inform patients of the "source of the drug" – that it came from an unaccredited, insanitary compounding pharmacy unregulated by the FDA – and "the dangers associated therewith", J.A. at 75, ¶ 204. | The "source of the drug" defendants neglected to inform patients about was from a location that was unregistered and unlicensed in violation of Section 54.1-3435.01(A) of the DCA, produced in insanitary conditions and containing a "deleterious" contaminate "injurious to health" as defined by Section 54.1-3461(A) and prohibited from sale and delivery by Sections 54.1-3457(1) and (3). |
| | Defendants failed to inform patients of the "source of the drug" or the "dangers" of being injected with drugs produced in clear violation of the DCA because defendants had represented to patients that the drugs they received were an FDA-approved, brand-name drug (see J.A. at 72, ¶ 181), in direct violation of |

13

| | |
|---|---|
| | Sections 54.1-3457(2), (7), and (10) of the DCA, prohibiting misbranding or falsely representing the identification of an adulterated drug. Instead, patients were illegally delivered adulterated contaminated drugs in violation of Sections 54.1-3457(1) and (3) of the DCA. |
| Defendants failed to exercise reasonable care to insure that the drugs were "made in compliance with Virginia pharmaceutical laws" and failure to exercise reasonable care to insure that the drugs were "sold . . . in compliance with Virginia pharmaceutical laws", J.A. at 75-76, ¶¶ 205 (a), (b). | By their direct reference, these allegations directly correspond to the prohibitions of the DCA, Virginia Code § 54.1-3400 et seq. |
| Defendants failed to know the "source and supply" of the adulterated drugs they provided, J.A. at 76, ¶ 205(c). | The allegations of Paragraph 205(c) refer to the fact that the "source and supply" of the drugs defendants were injecting into patients was from a location that was unregistered and unlicensed in violation of Section 54.1-3435.01(A) of the DCA, produced in insanitary conditions and containing a "deleterious" contaminate as defined by Section 54.1-3461(A) and prohibited from sale and delivery by Sections 54.1-3457(1) and (3). |
| Defendants failed to "ensure" that the drug was produced in "sanitary, sterile conditions", J.A. at 76, ¶ 205(d). | The drugs were produced, as alleged in the negligence count, not in "sanitary, sterile conditions" but in a pharmacy "surrounded by a garbage and waste facility" (see J.A. at 75, ¶ 204), the exact "insanitary conditions" defined by Section 54.1-3461(A)(2). "Adulterated" drugs meeting this definition are |

| | |
|---|---|
| | expressly prohibited from delivery and sale by Sections 54.1-3457(1) and (3) of the DCA. |
| Defendants failed to inform patients that the injections they received were an "off-label use", J.A. at 76, ¶ 205(e). | By "off label use", paragraph 205(e) refers to the fact that the methylprednisolone was not approved for use epidurally (see J.A. at 56, ¶ 55). No injuries were alleged due to use of methylprednisolone epidurally. Instead, injuries were only alleged to be due to receiving an adulterated, fungus-contaminated drug, the label of which was misrepresented to patients in violation of Sections 54.1-3457(2), (7), and (10) of the DCA, and delivered in violation of Sections 54.1-3457(1) and (3) of the DCA. |
| Defendants failed to properly inform patients of the "risks and dangers" associated with defendants having obtained drugs from an "unaccredited, non-FDA regulated compounding pharmacy" and injecting patients with this adulterated and contaminated drug, J.A. at 76, ¶ 205(f). | Sections 54.1-3457(1) and (3) expressly prohibit the sale and delivery of an adulterated drug to patients, created in insanitary conditions as set forth in Section 54.1-3461(A)(2) and produced an unregistered and unlicensed facility as required by Section 54.1-3435.01(A). <br><br> Defendants failed to inform patients of the "risks and dangers" of being injected with drugs produced from "unaccredited, non-FDA regulated" facility in clear violation of the DCA because defendants had instead represented to patients that the drugs they received were an FDA-approved, brand-name drug (see J.A. at 72, ¶ 181), in direct violation of Sections 54.1-3457(2), (7), and (10) of the DCA, prohibiting misbranding or falsely representing the identification of an |

| | adulterated drug. |
|---|---|
| Defendants failed to "adequately inform" treating physicians "regarding the actual source and identity" of the drug, J.A. at 76, ¶ 205(g). | Defendants failed to "adequately" inform treating physicians that patients would be injected with an adulterated drug obtained from an unregistered and unlicensed facility as set forth in Section 54.1-3435.01(A) because the drugs were injected under the guise that the drug was an FDA-approved version of methylprednisolone (see J.A. at 72, ¶ 181) in express violation of Sections 54.1-3457(2), (7), and (10) of the DCA, prohibiting such misbranding, false guarantees, or false representations regarding the sale or delivery of an adulterated drug. |
| Defendants failed to "avoid injecting" patients with an "adulterated drug", J.A. at 76, ¶ 205(h). | Sections 54.1-3457(1) and (3) of the DCA prohibit the delivery of adulterated drugs "for pay or otherwise". By not "avoid[ing]" injecting patients, instead, actually injecting patients with a contaminated drug produced in insterile conditions, defendants acted in clear violation of the DCA. |
| Defendants delegated to non-medical staff the choosing of safe drugs, J.A. at 76, ¶ 205(i). | By so delegating, the non-medical staff selected unsafe drugs made and obtained in violation of the DCA. The adulterated drugs obtained were later injected into patients causing the fungal infection injuries at issue, in violation of Sections 54.1-3457(1) and (3), preventing the delivery of such adulterated drugs. |

**The common law negligence Count III also incorporates previous**

**paragraphs of the Complaint, which allege the following additional violations**

16

**of the DCA.** Those "preceding paragraphs" allege that the compounding pharmacy:

\* "violated several provisions of Virginia statutes designed to protect Virginia citizens from substandard and adulterated prescription drugs," J.A. at 63, ¶ 115;

\* "was not registered as a wholesale distributor of prescription drugs as required by Virginia Code § 54.1-3435.01(A)", J.A. at 62, ¶ 110;

\* engaged in "large-scale production of [methylprednisolone]" which was "illegal under Virginia Code § 54.1-3410.2(H)(2)", J.A. at 59, ¶ 83; and

\* "failed to comply with USP-NF standards" in violation of Virginia Code § 54.1-4310.2(E), J.A. at 58, ¶¶ 77-78.

See also Artis Complaint, J.A. at 65-67, ¶¶ 132-139 and 140-148 (Defendants used false coding to misrepresent that the methylprednisolone was an FDA-approved drug, Depo-Medrol, from an FDA-regulated manufacturer. All such paragraphs pertain to one of the definitions of an adulterated drug under the DCA, as asserted at paragraph 176 of the Artis Complaint, J.A. at 71, i.e. that a drug that purports to be a drug recognized in an official compendium, but fails to meet the quality or purity standards set forth in the compendium or as prescribed by the federal act is a prohibited adulterated drug), and paragraphs 170-186, J.A. at 70-73, all of which allege express DCA violations, or the failure to avoid those violations. (See, e.g., ¶ 179 of the Artis Complaint, J.A. at 71, charging defendants

with violating the DCA "by receiving an adulterated drug in commerce and then delivering the drug for pay or otherwise to its patients.").

## SUMMARY OF THE ARGUMENT

In this action, every underlying complaint alleges liability arising out of violations of criminal statutes designed to prevent the sale of adulterated drugs (or, in the Group B cases, liability arising out of warranties that the drugs were safe). Broadly worded exclusions of the Policy preclude coverage for "damages arising out of or in connection with . . . an Insured's violation of any statute . . . that provides for any criminal penalty whether or not there is a criminal charge, prosecution, or conviction," and "damages arising out of or in connection with . . . warranting (express or implied) or solicitation of Professional Services[.]"

Here, every factual allegation in the underlying complaints falls within the broad language of the criminal acts exclusion (or, in the Group B cases, the warranty exclusion), notwithstanding that they each include counts for common law negligence. The negligence claims in these underlying complaints are inextricably intertwined with the causes of action for negligence *per se* based on violations of the DCA, alleged the same resulting harm (injury due to sale and use of adulterated, fungus-contaminated steroids), sought the same damages, and alleged essentially the same facts, and therefore necessarily "arose out of" or were "in connection with" the excluded conduct. The two "breach of warranty"

complaints also feature negligence counts that are inextricably intertwined with the excluded causes of action for breach of warranty, alleging the same resulting harm, seeking the same damages, based on the same facts. As a fundamental proposition, negligence claims that are "inextricably intertwined" with activities that are excluded under broad language such as "in connection with", are necessarily encompassed within those exclusions.

**The District Court actually stated in its opinion that the negligence claims in the underlying suits "may be inextricably intertwined" with the excluded conduct,** but held that the inclusion of any negligence allegation was enough to trigger the duty to defend. The District Court cited as specific examples two stray references in the underlying "negligence *per se*" lawsuits to "off label use" and "informed consent" -- neither of which is alleged to cause any damage except the exact same one alleged to result from negligence *per se* -- the sale and use of adulterated, fungus-contaminated steroids.

In rejecting the notion that such an "inextricably intertwined" allegation could somehow trigger a duty to defend, the District Court made no analysis whatsoever of the "arising out of or in connection with" language of the exclusion, thus ignoring the authority, well established in this Circuit, holding that such language is extremely broad in its reach. Moreover, the District Court ignored a wealth of contrary authority from courts everywhere to the effect that such

"inextricably intertwined" allegations are encompassed within that broad exclusionary language.

The Policy was not intended to provide coverage for violations of criminal statutes, and certainly not for those prohibiting the sale of adulterated drugs. Consistent with that purpose, the policy utilizes broad exclusionary language designed to avoid the very sleight of hand at work here, i.e., the attempt to create coverage by peppering the complaint with references to negligence that either are no more than a rephrasing the allegations of statutory violations, or are allegations unrelated to any damage asserted in the underlying complaints -- like the allegations of "off label" use and failure to obtain informed consent to the procedure involve, that the District Court pointed to. The only damage asserted in the underlying complaints is for injury due to the sale and administration of adulterated, fungus-contaminated drugs, for which coverage is clearly excluded. Fundamentally, **allegations unrelated to damages do not trigger a duty to defend, as this Court has previously held.** Upon the analysis set forth below, the order of the District Court granting defendants' Motion to Dismiss should be reversed.

20

# ARGUMENT

## I.    STANDARD OF REVIEW

Review of a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) is *de novo*.  "We also review de novo a district court's assessment of an insurance policy, in that issues of contract interpretation constitute questions of law."  Barnhill v. Veneman (In re Peanut Crop Ins. Litig.), 524 F.3d 458, 470 (4th Cir. 2008), citing Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 512 (4th Cir. 1994).  Thus, the District Court's determination of the duty to defend under Virginia's "eight corners" rule is a conclusion of law subject to de novo review by this Court.  National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co., 162 F.3d 821, 824 (4th Cir. 1998).

## II.   COVERAGE IS NOT AFFORDED UNDER THE "POTENTIALITY RULE"

### A.    Introduction

Medical Mutual brought this declaratory judgment action to determine its duty to defend a number of cases alleging that Medical Mutual's insureds engaged in trafficking of adulterated, fungus-contaminated steroids that injured patients to whom they were administered.  Medical Mutual's Policy does not insure health care providers for damages arising out of the illegal purchase and sale of drugs in violation of the DCA.  Instead, the Policy expressly excludes coverage for

damages "arising out of" or "in connection with" violations of statutes such as the DCA, which carry criminal penalties.

The underlying lawsuits were filled with extensive allegations of DCA violations giving rise to causes of action for negligence *per se* or for breach of warranty. In every instance, the only alleged cause of the plaintiffs' injuries was the receipt of adulterated, fungus-contaminated steroids.

The District Court dismissed Medical Mutual's complaint on a finding that, buried within the allegations of the underlying complaints were assertions of failure to obtained informed consent for the procedure used, and "off label" use of the drug in question, methylprednisolone, epidurally.

In doing so, the District Court "picked out" two allegations from the complaints notwithstanding that every claim in the lawsuits implicated, and attributed the plaintiffs' injuries solely to, administration of steroids which were adulterated due to, and sold in violation of, the DCA.

Specifically, of those paragraphs of the Artis Complaint that assert misconduct by the insured defendants, 52 of those paragraphs or sub-paragraphs allege DCA violations, all alleged to have caused the plaintiff to receive a drug that was adulterated because it was contaminated. See Artis Complaint, J.A. at 65-68, ¶¶ 132-139 and 140-148 (false coding to misrepresent that the methylprednisolone was from an FDA-regulated manufacturer, and misrepresentation of the

22

methylprednisolone as an FDA-approved drug, Depo-Medrol, all of which pertain to one of the definitions of an adulterated drug under the DCA, as asserted at paragraph 176 of the Artis Complaint, J.A. at 71, i.e. a drug that purports to be a drug recognized in an official compendium, but fails to meet the quality or purity standards set forth in the compendium or the federal act), and J.A. at 70-77, ¶¶ 170-186, 195-204 and 205 (a), (b), (c), (d), (f), (g), (h), (i) (all of which allege express DCA violations, or the failure to avoid those violations).

Of those paragraphs of the Artis Complaint that assert misconduct by the insured defendants, **one sub-paragraph**, J.A. at 76, ¶ 205(e), alleges the failure to warn the patient that the methylprednisolone was being used "off label" -- i.e., that methylprednisolone had never been approved for use epidurally.  **Nowhere does the complaint allege that such "off label" use caused the drug to become contaminated, or that such "off label" use -- as opposed to the use of an adulterated, fungus-contaminated drug in violation of the DCA -- caused any injury.**

Of those paragraphs of the Artis complaint that assert misconduct by the insured defendants, **one paragraph**, J.A. at 75, ¶ 203, alleges the failure to obtain informed consent "for the procedure performed on" plaintiff by describing the risks of that procedure.  **Nowhere does the Complaint allege that the "procedure"**

**performed on the plaintiff -- as opposed to the use of an adulterated, fungus-contaminated drug in violation of the DCA -- caused any injury.**

The Policy does not insure health care providers against violations of drug anti-adulteration laws, which carry criminal penalties. Acknowledging the Policy's exclusion for such conduct, and admitting that the two stray "off label use" and "informed consent" paragraphs "may be inextricably intertwined" with the 52 paragraphs of the Complaint alleging violations of the anti-adulteration statutes, the District Court simply held that allegations of failure to warn as to "off label" use and failure to obtain informed consent were traditional medical malpractice claims that did not fall within the exclusion, and thus triggered a duty to defend. Mem. Op., J.A. at 925.

In determining that the Artis Complaint set forth allegations that could potentially lead to an award of covered damages, the District Court effectively "picked out" (or more accurately, allowed the insureds to pick out) two isolated paragraphs alleging conduct that did not result in any injury, for the purpose of creating a duty to defend, **notwithstanding that every claim of negligence or negligence *per se* against the insureds, implicated the anti-adulteration statutory violations, and notwithstanding that every allegation of injury was attributable solely to adulteration resulting from the those violations.** See Minnesota Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP, 472

24

Fed. Appx. 219, 224 (4th Cir. 2012) ("Virginia's potentiality rule requires us to examine the complaint and determine whether any potential judgment under that complaint would fall within the Policy. **This process does not disregard the actual allegations that are made.**"), <u>citing</u> <u>Nationwide Mut. Ins. Co. v. Overlook, LLC</u>, 785 F. Supp. 2d 502, 533 (E.D. Va. 2011) (**refusing insured's attempt to pick out certain allegations because "every claim in the underlying . . . complaint implicates the defective drywall as the basis for the claim**, or the cause of the resulting damages.").

The exclusion is a broad one, consistent with its purpose: the Policy does not, and was never intended to, insure damages resulting from criminal acts -- and most certainly not damages resulting from the purchase and sale of adulterated drugs, which Virginia (like all states and commonwealths) forbids on pain of criminal prosecution. As a result, the Policy clearly excludes from coverage damages not only caused by such violations, but also damages that "aris[e] out of", or are "in connection with" such excluded conduct.

The District Court simply made no analysis whatsoever of the breadth of the exclusionary language. If it had, it would have been forced to conclude that:

(i)     The phrase "arising out of" as it appears in an exclusion in an insurance policy is given a broad, general and comprehensive interpretation ordinarily understood to mean "originating from," "having its origin in,"

"growing out of" or "flowing from," or in short, "incident to, or having connection with" the excluded matter. Damages alleged to be outside the exclusion have their origin in, and are incident to, the excluded conduct if the damage would not have occurred "but for" the excluded conduct.

In this case, the excluded activity was the purchase, holding and sale of adulterated drugs in violation of criminal statutes. No injury of any kind is asserted in the complaints other than injuries suffered as a result of receiving adulterated drugs that were acquired and sold in violation of anti-adulteration provisions of the DCA. Thus, the asserted injury "arose out of" the statutory violations; and

(ii)    The phrase "in connection with", when used in a policy exclusion, has been found to be unambiguous and has been interpreted even more broadly than the phrase "arising out of", to mean "related to", "linked to", or "associated with".

In this case, the allegations focused on by the District Court as not being encompassed within the exclusion, regarding "off label use" and "informed consent", were most certainly related to allegations of DCA violations where the only alleged cause of harm to the plaintiffs was illness induced by the receipt of adulterated drugs.

But the specific allegation of failure to obtain informed consent accuses defendants of failing to inform the plaintiffs that they were receiving "**a knock-off drug from a compounding pharmacy … with the characteristics and problems as described in the preceding paragraphs**".   Artis Complaint, J.A. at 65, ¶ 126. **Those "characteristics" were the myriad violations of the DCA, which defendants themselves were charged with violating** by receiving an adulterated drug in commerce and then delivering the drug for pay or otherwise to its patients. Id., ¶ 179.

How can damages flowing from failure to inform the plaintiffs about "off label" use of the steroids, or about failure to obtain informed consent as to such procedure, not be "related to", "linked to", or "associated with" the violations of the DCA, where the only injury alleged in the entire Complaint is attributed solely to the fact that the steroids were adulterated?   Again, the District Court offers no answer, because it performed no analysis, discussed no case law, and indeed failed even to discuss the relevant policy language.

Nevertheless, under the authority cited below, it is clear that any alleged negligence pertaining to a failure to obtain informed consent or to "off label" use of adulterated, fungus-contaminated steroids is "related to" the illegal conduct that caused the steroids to become adulterated, and to the illegal sale of the adulterated steroids in violation of the DCA.

27

Amazingly, the District Court essentially acknowledged the relatedness of the isolated contentions in the complaints regarding informed consent and off label use when it conceded those allegations "may well be inextricably intertwined" with the myriad allegations in the complaints of DCA violations. Mem. Op., J.A. at 925. In holding that "inextricably intertwined" allegations of negligence were nevertheless separate claims triggering a duty to defend, rather than claims "related to", "linked to", or "associated with" claims falling within the exclusion, the District Court ignored a wealth of authority to the contrary, again failing to offer any analysis based on either the language of the Policy or relevant case law.

The District Court committed the same error with regard to claims asserting harm attributable only to adulterated, fungus-contaminated steroids, but basing their cause of action on breach of express and implied warranties, as well as DCA violations. The Policy excludes coverage for claims arising out of or in connection with breaches of warranty. None of the Complaints alleged any injuries attributable to separate acts of negligence -- instead the injury was attributable to the drugs not being safe as warrantied. Consequently, these claims were most certainly claims "related to", "linked to", or "associated with" claims falling within the exclusion.

**B.    The Phrase "Arising Out Of" Is Interpreted Broadly To Apply Whenever The Damage Alleged to Flow From A Non-Excluded Activity Would Not Have Occurred But For The Excluded Act.**

28

The District Court determined that Medical Mutual owed a duty of defense because an allegation of failure to provide informed consent does not require proof of a violation of the DCA. The Court offered no analysis as to why the alleged failure to obtain informed consent to give patients adulterated steroids did not "arise out of", or was not "in connection with" the alleged violations of the statute intended to prevent the sale and use of adulterated drugs.

Let's first examine the phrase "arising out of" in the context of the allegations of the Complaint:

"The phrase 'arising out of' is not itself ambiguous and has a plain meaning that is not difficult to discern. In the insurance context 'arising out of' is broader than 'caused by,' and ordinarily means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' or 'incident to or having connection with.'" Trex Co. v. Exxonmobil Oil Corp., 234 F. Supp. 2d 572, 576 (E.D. Va. 2002), quoting St. Paul Fire and Marine Insurance Co. v. Insurance Company of North America, 501 F. Supp 136, 138 (W.D. Va. 1980) (applying Virginia law) (citing Red Ball Motor Freight v. Employers Mutual Liability Ins. Co., 189 F.2d 374, 378 (5th Cir. 1951).[5]

---

[5]    See also Gemini Ins. Co. v. Trident Roofing Co., 2010 U.S. Dist. LEXIS 5457, at *8 (N.D. Tex. Jan. 22, 2010) ("Texas courts construe the phrases 'arise out of,' 'related to,' or 'connected with' broadly in the context of insurance exclusions."); Beretta, U.S.A., Corp. v. Federal Ins. Co., 117 F. Supp. 2d 489, 493-94 (D. Md. 2000) (citing cases).

A *prima facie* case of medical malpractice based on failure to obtain informed consent requires a showing that the physician owed a duty to make reasonable disclosure to the patient of all consequences of using a remedy, i.e., all significant facts under the circumstances.[6] **Here, the only "significant facts" alleged not to have been disclosed to the patients are those acts that constituted violations of the DCA. The reason defendants even knew about such facts, according to the Complaint, is that defendants had committed those very violations.**

**Moreover, no damages alleged to have resulted from the breach of the duty to provide informed consent regarding the <u>procedure</u>, or from "off label" use the steroids epidurally. Instead, the only injury alleged is injury and death from receiving adulterated fungus-contaminated steroids as a result of DCA violations.**

**Indeed, any injury that could conceivably be attributed to these isolated allegations of negligence could not have occurred but for the purchase and sale of the tainted steroids by the insured defendants.** This is a classic "arising out of" set of facts. <u>See</u> <u>Brazas Sporting Arms, Inc. v. American Empire Surplus</u>

---

[6]    <u>See</u> <u>Rizzo v. Schiller</u>, 248 Va. 155, 158-59 (Va. 1994) ("[A] physician owes a duty to make a reasonable disclosure to the patient of all significant facts under the circumstances", which includes a duty to exercise ordinary care to warn a patient of the danger of possible bad consequences of using a remedy) (citations omitted).

30

Lines Ins. Co., 220 F.3d 1, 7 (1st Cir. 2000) ("In interpreting the phrase 'arising out of' in the context of the case at hand, we are compelled by Massachusetts law to consider the source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint of the underlying civil action. Thus, in this case, firearms were the immediate source of the plaintiffs' injuries, and the fact that the plaintiffs, to reach the deep pockets of the firearms industry, contrived a theory of liability that targeted Brazas for its alleged participation in flooding the firearms market cannot affect the application of the exclusion provision.") (internal citations and punctuation omitted).

Thus, in Scottsdale Ins. Co. v. Mt. Hawley Ins. Co., 2011 U.S. Dist. LEXIS 156386, at *16-17 (S.D. Tex. June 15, 2011), aff'd, 488 Fed. Appx. 859 (5th Cir. Sept. 14, 2012), the court wrote:

> [W]hen an exclusion prevents coverage for injuries 'arising out of' particular conduct, "[a] claim need only bear an *incidental relationship* to the described conduct for the exclusion to apply." Sport Supply Group, Inc. v. Columbia Cas. Co., 335 F.3d 453, 458 (5th Cir. 2003) (quoting Scottsdale Ins. Co. v. Tex. Sec. Concepts & Investigation, 173 F.3d 941, 943 (5th Cir. 1999)). Such an exclusion "is given a broad, general, and comprehensive interpretation." Scottsdale, 173 F.3d at 943. "'[A]rising out of' are words of much broader significance than 'caused by.'" EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 438 F.3d 519, 524 (5th Cir. 2006) (quoting Red Ball Motor Freight v. Emp'rs Mut. Liab. Ins. Co., 189 F.2d 374, 377 (5th Cir. 1951)) (applying Texas law). "They are ordinarily understood to mean "originating from[,]" "having its origin in," "growing out of" or "flowing from," or in short, "incident to, or having connection with'...." It also bears noting that 'the label attached to the cause of action—whether it be tort, contract, or

31

warranty **-** does not determine the duty to defend." <u>Lamar Homes, Inc. v. Mid-Continent Cas. Co.</u>, 242 S.W.3d 1, 13 (Tex. 2007) (quoting [<u>Farmers Tex. Co. Mut. Ins. Co. v.</u>] <u>Griffin</u>, 955 S.W.2d [81], 82 [(Tex. 1997)]). "A court must focus on the factual allegations rather than the legal theories asserted in reviewing the underlying petition." <u>Griffin</u>, 955 S.W.2d at 82.[7]

**C.    The Phrase "In Connection With" Is Interpreted Even More Broadly Than The Phrase "Arising Out Of", And Is Held To Mean "Related To", "Linked To", Or "Associated With".**

Whereas the term "arising out of" requires a nexus -- although not one amounting to proximate causation -- between the asserted negligence and the excluded activity -- such nexus typically being satisfied by a finding that but for the excluded conduct, no damages would have resulted from the asserted negligent act -- the phrase "in connection with" has a far broader meaning not tethered to "but for" causation, or causation of any kind.

---

[7]    <u>See</u> <u>also</u> <u>Wilkins v. American Motorists Ins. Co.</u>, 97 N.C. App. 266, 271-72, 388 S.E. 2d 191, 192-93 (N.C. Ct. App. 1990) (The plaintiff's homeowners policy had an exclusion provision that did not provide coverage for injuries "arising out of the ownership, maintenance, use, loading or unloading of: (1) an aircraft[.]" The claims were excluded from policy coverage because the alleged failure to warn of the damage to the airplane and negligent instruction to the pilot, "are causes which involve the use of the aircraft and . . . they could cause no injury that was not directly connected to the use of the aircraft."); <u>Continental Cas. Co. v. Richmond</u>, 763 F.2d 1076, 1080 (9th Cir. 1985) (The Court in <u>Hartford Accident & Indemnity Co. v. Civil Service Employees Insurance Co</u>., 33 Cal. App. 3d 26, 108 Cal. Rptr. 737 (Cal. Ct. App. 1973), "held that 'arising out of the use of an insured vehicle imports some kind of sequential relationship between the vehicle and the accident.' 33 Cal. App. 3d at 32-33, 108 Cal. Rptr. at 741. Thus, the biting of an automobile passenger by a dog that was being transported in the vehicle was held to arise from the use of the vehicle and was covered by the policy. The court added that 'arising out of' has been interpreted more broadly than 'caused by' to include the notion of 'incident to or having connection with.' <u>Id.</u>")

As compared to the phrase "arising out of", "[t]he phrase 'in connection with,' by contrast, has a broader meaning and does not imply a causal connection." Headley-Ombler v. Holder, 2013 U.S. Dist. LEXIS 171699, at *20 (E.D.N.Y. Dec. 5, 2013), citing Empire HealthChoice Assur. Inc. v. McVeigh, 396 F.3d 136, 157 (2d Cir. 2005) ("in connection with" is a broader term than "arising out of") (citing cases). See also Camico Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP, 2013 U.S. Dist. LEXIS 91649, at *25 (E.D. Pa. June 27, 2013) ("Noting that a cardinal rule of contractual interpretation counsels against rendering words or provisions meaningless, the Court finds the terms 'related to' and 'in connection with' to be broader in meaning than "arising out of alone.") (citation and internal punctuation omitted).

As the Second Circuit held in Coregis Ins. Co. v. American Health Found., 241 F.3d 123, 128-29 (2d Cir. 2001):

> The term "related to" is typically defined more broadly and is not necessarily tied to the concept of a causal connection. Webster's Dictionary defines "related" simply as "connected by reason of an established or discoverable relation." Webster's Third New International Dictionary, supra, at 1916. The word "relation," in turn, as "used especially in the phrase 'in relation to,'" is defined as a "connection" to or a "reference" to. Id. at 1916. Courts have similarly described the term "relating to" as equivalent to the phrases "in connection with" and "associated with," see Jackson v. Lajaunie, 270 So. 2d 859, 864 (La. 1972), and synonymous with the phrases "with respect to," and "with reference to," see Phoenix Leasing Inc. v. Sure Broad., Inc., 843 F. Supp. 1379, 1388 (D. Nev. 1994), aff'd, 89 F.3d 846 (9th Cir. 1996), and have held such phrases to be broader in scope than the term "arising out of." See Jackson, 270 So. 2d at 864 ("'In

connection with' is a broader term than 'arising out of the use of the premises for the purposes' of a service station. . . . This [injury] was linked to the station, associated with the station, related to the station, and, in the absence of a new and restrictive definition of an old and well understood word, connected with the station." (internal citations and footnote omitted)); cf. Cameron Mut. Ins. Co. v. Skidmore, 633 S.W.2d 752, 753 (Mo. Ct. App. 1982) ("It appears to us that 'in connection with' [any premises] has a broader meaning than 'arising out of any premises.'").

See also Metropolitan Property and Cas. Ins. Co. v. Fitchburg Mut. Ins. Co., 793 N.E.2d 1252, 1255 (Mass. Ct. App. 2003) (While "arising out of" is ordinarily held to mean "originating from, growing out of, flowing from, incident to or having connection with", "[i]n connection with" is ordinarily held to have even a broader meaning than "arising out of" and is defined as "related to, linked to, or associated with"), citing Cameron Mut. Ins. Co. v. Skidmore, 633 S.W.2d 752, 753 (Mo. Ct. App.1982) and Nationwide Mut. Fire Ins. Co. v. Nunn, 442 S.E.2d 340 (N.C. Ct. App. 1994) (finding that business exclusion in homeowner's insurance policy precluded coverage, based on interpretation of the phrase, "in connection with", as being broader the phrase, "arising out of").  See also Acadia Ins. Co. v. Vermont Mut. Ins. Co., 2003 Me. Super. LEXIS 260, at *1-2 (Me. Super. Ct. Aug. 18, 2003) (The phrase "in connection with" as used in business pursuits exclusion was unambiguous and excluded coverage.  "'In connection with' is ordinarily held

to have even a broader meaning than 'arising out of' and is defined as related to, linked to or associated with.").[8]

**D.  The Negligence Counts Are Based On, Arise Out Of, And Are "In Connection With" The Anti-Adulteration Statutory Violations, Where They Implicate Those Statutory Violations As The Basis For The Relief Sought.**

There can be no doubt whatsoever that the "informed consent" allegation of negligence in the underlying "negligence per se" complaints are "related to", "linked to", or "associated with" the allegations of violations of the DCA. Paragraph 126 of the Artis Complaint, alleges that defendants "**did not inform [plaintiff] that they were receiving a knock-off drug from a compounding pharmacy, much less a compounding pharmacy with the characteristics and problems as described in the preceding paragraphs.**"  J.A. at 65.

What are those "**characteristics and problems as described in the preceding paragraphs**"?  **They are DCA violations causing the steroids to be adulterated**.  Thus, those "preceding paragraphs" allege that the compounding pharmacy "violated several provisions of Virginia statutes designed to protect Virginia citizens from substandard and adulterated prescription drugs",  J.A. at 63, ¶ 115; "was not registered as a wholesale distributor of prescription drugs as

---

[8]    See also United States v. Loney, 219 F.3d 281, 284 (3d Cir. 2000) ("in connection with" denotes a "wide range of relationships"); United States v. Wyatt, 102 F.3d 241, 247 (7th Cir. 1996) ("the meaning of the phrase 'in connection with' should be construed expansively"); United States v. Thompson, 32 F.3d 1, 7 (1st Cir. 1994) ("[T]he phrase 'in connection with' should be interpreted broadly . . . .").

required by Virginia Code § 54.1-3435.01(A)", J.A. at 62, ¶ 110; engaged in "large-scale production of [methylprednisolone]" which was "illegal under Virginia Code § 54.1-3410.2(H)(2)", J.A. at 59, ¶ 83; and "failed to comply with USP-NF standards" in violation of Virginia Code § 54.1-4310.2(E), J.A. at 58, ¶¶ 77-78.

And of course, **allowing their patients to "receive" steroids from a compounding pharmacy that "violated several provisions of Virginia statutes designed to protect Virginia citizens from substandard and adulterated prescription drugs" is the precise illegal conduct that the defendant insureds are charged with under the complaint's "negligence per se" count.** That Count, at ¶ 179 of the Artis Complaint, charges defendants with violating the DCA "by receiving an adulterated drug in commerce and then delivering the drug for pay or otherwise to its patients." J.A. at 71.

The District Court's opinion contained not one whit of analysis, either of the specific allegations in the Complaint pertaining to informed consent or "off label" use, or of the presence of (let alone the required broad interpretation of) the phrase "in connection with" in the exclusion. The Court simply held that the negligent failure to obtain informed consent, and the assertion of "off label" use, did not require proof of violations of the DCA -- a holding which in and of itself shows

36

unequivocally that the District Court simply ignored the specific language of the applicable exclusion. Mem. Op., J.A. at 925.

Moreover, the fact that allegations pertaining to "off label" use or informed consent are not caused by violations of the DCA is neither here nor there when those allegations do not lead to any claimed damages or damages that differ from those caused by statutory violations, under a policy broadly excluding claims "arising out of" or "in connection with" statutory violations.

The phrase "in connection with" has been held to bar coverage under an exclusion applying to statutory violations that also excluded other claims made "in connection with" any such violations. The Tenth Circuit in <u>Bendis v. Federal Ins. Co</u> affirmed a holding that an exclusion for statutory securities violations and for all claims arising out of or related to such violations, encompassed common law claims for negligent misrepresentation. 958 F.2d 960, 963 (10th Cir. 1991), affirming the district court's decision at 1989 U.S. Dist. LEXIS 15930 (D. Kan. Dec. 1, 1989) ("The language of the exclusion evinces a plain intent to bar coverage for claims related in any way to securities violations. Because the common law tort claims are based upon the same factual allegations which form the basis for the alleged violations of securities laws[,] the court finds that the tort claims are so related to the alleged securities violations as to put them squarely within the express terms of the policy exclusion."). <u>Accord, Salomon v. Phila. Ins.</u>

Cos., 2014 U.S. Dist. LEXIS 8334, at *25-26 (D. Mass. Jan. 23, 2014) ("[T]he gravamen of the factual allegations in the [complaint] is that Salomon negligently recommended the Elkinson investment to him based on Marcus's misrepresentations. **Standing alone, these allegations would not necessarily bring the claim within any of the exclusions. . . Critically, however, Davidson also alleged a number of violations of the Massachusetts Uniform Securities Act which rely on the same factual allegations as the common law claims**. . . T]heir assertion underscores that the entire complaint falls squarely within the scope of the Securities Practice Exclusion because the common law claims were 'made in connection with an . . . alleged violation of . . . State Blue Sky Laws.'") (emphasis added).

Similarly, in Evanston Ins. Co. v. Bulkley, 2005 U.S. Dist. LEXIS 22507 (D.N.J. Sept. 23, 2005), Chisholm, a hearing-impaired patient, alleged that a doctor, Bulkley, violated the Americans for Disabilities Act. Dr. Bulkley's policy excluded claims "arising out of" statutory violations, intentional acts, and discrimination on the basis of physical handicap. Chisholm also claimed that after Dr. Bulkley "terminated" the doctor-patient relationship, Chisolm was "left unmonitored . . . while he waited to obtain a new doctor", a claim the Court treated as sounding in negligence. 2005 U.S. Dist. LEXIS 22507, at *16, n. 2.

That negligence claim hardly required proof of statutory violations or of discrimination. But the Court, observing that Chisholm's "complaint abounds in allegations that Dr. Bulkley's conduct -- in refusing to provide an interpreter and in terminating the doctor-patient relationship -- constituted a violation of state and federal law," found the negligence allegation to be one "arising out of" the exclusions for discrimination and intentional acts. 2005 U.S. Dist. LEXIS 22507, at *16, n. 2.

In Bendis v. Federal Ins. Co., supra, 958 F.2d 960, and Salomon v. Phila. Ins. Cos., supra, the common law claims were not described in, nor did they require proof of, the alleged statutory violations. But the common law claims were clearly related to and made in connection with the statutory-based claims, for the same reasons that the stray assertions in the negligence *per se* cases as to "off label" use and informed consent must be considered to be "in connection with" the asserted DCA violations.

Here, the "gravamen" of the claims is most certainly the alleged violations of the DCA. The only damages alleged anywhere in the "negligence *per se*" complaints is injury due to adulterated, fungus-contaminated drugs, the only asserted causes of that adulteration are violations of the DCA, and each count relies on the same factual allegations as to how the drugs became adulterated. The stray allegations of failure to obtain informed consent and of "off label" use in no

39

way allege any different damages. Consequently, the common law negligence claims are clearly made "in connection with" the alleged statutory violations.

**E.    Allegations Of Negligence That Are "Inextricably Intertwined" With Excluded Claims Necessarily "Arise Out Of" And Are "In Connection With" The Exclusion.**

In its opinion, the District Court acknowledged that the Complaint's negligence allegations "may well be inextricably intertwined with" the claims of injury due to adulterated, fungus-contaminated drugs sold in violation of the DCA. Mem. Op., J.A. at 925. Because the allegations of injury in the Complaint are limited to the injury flowing from the statutory violations, the broad language of the policy exclusions utilizing the "in connection with" language of the applicable exclusions precludes coverage for claims "inextricably intertwined" with them.

In holding otherwise, the District Court erred as a matter of law. The court ignored, and offered not a whit of discussion of, **the plethora of case law standing for the proposition that even under exclusions that extend only to damages "arising out of" the excluded activity, acts of negligence that are "inextricably intertwined" with excluded acts do not create covered claims.**

The list of cases so holding is as long as your arm. See National Union Fire Ins. Co. v. U.S. Liquids, Inc., 88 Fed. Appx. 725, 730 (5th Cir. 2004) ("Polluting activities committed by USL and its directors and officers are precisely what was misrepresented and not disclosed to USL's shareholders and are thus 'inextricably

40

intertwined' with the company's and its shareholders' losses. Therefore, the causes are concurrent, which renders National Union not liable."); <u>Allstate Ins. Co. v. Moraca</u>, 244 N.J. Super. 5, 17-18, 581 A.2d 510, 517-18 (N.J. Ct. App. 1990) ("negligent entrustment of a motor vehicle is not independent of, but rather inextricably intertwined with, the more general concepts of ownership, operation, and use of a motor vehicle…[T]he triggering element is negligent use of the item, for even if the entrustment was negligent, no cause of action could arise without an injury caused by negligent use of the item.  Because negligent use is essential, negligent entrustment arises out of the use of a certain instrumentality. Thus, the exclusion applies.") (internal citations and punctuation omitted); <u>See</u> <u>Nautilus Ins. Co. v. 1452-4 N. Milwaukee Ave., LLC</u>, 562 F.3d 818, 821-23 (7th Cir. 2009) (contractor-subcontractor policy exclusion, which excludes from coverage all property damage claims "arising out of operations performed for you by contractors or subcontractors you hire or your acts or omissions in connection with your general supervision of such operations," covers all "intertwined claims" that provide "an alternative theory of relief" based on the same factual allegations); <u>Great Divide Ins. Co. v. Midnight Rodeo, Inc.</u>, 2010 U.S. Dist. LEXIS 51598, at *14-15 (E.D.N.C. May 24, 2010) ("Given the plain language of the insurance policy and the allegations in the Underlying Action, however, this separation is not possible as the allegations of physical assault and negligence are inextricably

41

intertwined.  As set forth in the policy and recounted herein, the plain language of the exclusion explains that any injury *arising out of* any assault and battery or any act *or* omission in connection with the prevention or suppression of such acts, including the alleged failure to provide adequate security is not covered by the policy . . . .") (emphasis in original); Robinson v. Hudson Speciality Ins. Group, 2013 U.S. Dist. LEXIS 151403, at *18 (S.D. Ala. Oct. 22, 2013) ("As alleged, the basis for Robinson's Alabama Dram Shop Act claim is that Crown Theater's club unlawfully provided alcoholic beverages to the shooters (people under the influence of alcohol). Robinson's negligence claims are **inextricably intertwined** with his alcohol claims, which fall under what are clear and unambiguous terms of the Colony liquor liability exclusion."), citing State Auto Mut. Ins. Co. v. Lucchesi, 2012 U.S. Dist. LEXIS 77733, at *13 (M.D. Pa. Jun. 5, 2012) ("In determining whether a liquor liability exclusion applies, the Court must look to the factual averments in the complaint and may not rely simply on the labels applied to those averments.  To permit the manner in which a complaint frames the case to govern whether an exclusion applies 'would encourage litigation through the use of artful pleadings designed to avoid exclusions in liability insurance policies.'") (internal citation omitted); Morgan v. Utica Mut. Ins. Co., 2000 U.S. App. LEXIS 22710, at *9-10 (6th Cir. Aug. 30, 2000) ("**There is no element of the complaint's factual recitations that is not inextricably bound up with**

42

**Morgan's business pursuits. Focusing on the substance of the complaint and not the particular description chosen by Curtis**, the Georgia complaint does not allege defamation against Michael Curtis personally that does not at least 'arise out of' his business pursuits with Morgan. Therefore, the district court correctly found that Graphic Arts and Utica were not obliged to provide Morgan with a defense.") (emphasis added); Clinch v. Generali-U.S. Branch, 110 Conn. App. 29, 39, 954 A.2d 223, 230 (Conn. Ct. App. 2008), aff'd, adopted by 293 Conn. 774, 980 A.2d 313 (2009) ("The plaintiff argues that on the basis of the language of the complaint, one could entertain a variety of causes for some of his injuries unrelated to assault and battery. **The negligent acts that he describes, however, are tied inextricably by the language of the complaint to assault and battery.**") (emphasis added).[9]

---

[9]     See also Bertagnolli v. Association of Trial Lawyers Assur., 934 P.2d 916, 919 (Colo. Ct. App. 1997) ("Moreover, it is of no consequence that other facts, not directly related to the sexual assaults, are required to establish one or more of the tort claims alleged by plaintiff; any other such facts necessarily are **so** intertwined with the sexual assaults as to be inseparable.  As the trial court observed, '[plaintiff's] attempt to fragment the illegal sexual assault into a series of non-criminal acts ignores the reality of the situation -- each was but one step in the culmination of the single criminal episode and as such is excluded from coverage.'"); Lancia v. State Nat'l Ins. Co., 134 Conn. App. 682, 698 (Conn. Ct. App. 2012) ("Even if we were to construe Lancia's alleged conduct as the rendering of legal services, for which Lancia might otherwise be covered under the policy, any such conduct, as alleged, arises out of and is **inextricably intertwined** with his conduct as the owner or principal of Royal and his role as a mortgage broker.  Thus, we conclude that the exclusion in the policy unambiguously establishes that the defendants do not have a duty to defend Lancia in any of the

**F.    Allegations That Methylprednisolone Was Used "Off Label" Or That "Informed Consent" Was Not Obtained For The "Method Of Treatment", Do Not Trigger The Duty To Defend, Where The Only Injury Alleged Is Illness Due To The Use Of Adulterated, Fungus-Contaminated Steroids In Violation of The DCA.**

It is true, as the District Court noted, that buried in the vast pile of DCA

violations is an assertion that defendants failed to tell their patients that giving

methylprednisolone epidurally was an "off label" use.  Mem. Op., J.A. at 925. The

---

four underlying actions."); Celotex Corp. v. AIU Ins. Co., 149 B.R. 997, 1001 (Bankr. M.D. Fla. 1993) ("[T]he Court finds the alleged damages resulting from the failure to warn of the dangers involved in the use of the asbestos-containing products are **sufficiently tied to** the nature of Debtor's products to warrant denominating the liability as products hazard, * * * Any liability based upon negligent failure to warn of those innate dangers is **directly associated with** the product."); Stafford v. Scottsdale Ins. Co., 416 Fed. Appx. 191, 195 (3d Cir. 2010) ( "Viewed in such a light, it is readily apparent that an insured's negligence in supervising the cause of the harm cannot, as a matter of logic, be considered a source of liability that is isolable from the harm itself.  To the contrary, the two are **inextricably intertwined**; there is no liability, but for the harm."); Westfield Ins. Co. v. Hill, 790 F. Supp. 2d 855, 868 (N.D. Ind. 2011) ("A claim for injury arising out of sexual molestation or physical or mental abuse is not a risk that Westfield agreed to insure. Roe's claim that the Hills' negligent ownership, supervision, and management of their property led to Doe's molestation and injury are inextricably intertwined with this excluded risk."); Old Republic Ins. Co. v. Comprehensive Health Care Assocs., Inc., 2 F.3d 105, 109 (5th Cir. 1993) "(Both slander of the employees' work reputations, whether it occurred during or after their employment at CHCA, and the negligence claims against CHCA are inextricably intertwined with the underlying sexual harassment and discrimination claims.") (emphasis added); Stevens v. Fireman's Fund Ins. Co., 375 F.3d 464, 467 (6th Cir. 2004) ("It seems to us that dispatch of a truck driver - unlike supervision of a child, for instance - cannot be considered "independent of, and unrelated to" use of a truck. The dispatch has no purpose, after all, other than to get the truck moving. Dispatch, in this respect, is comparable to hiring, supervision, or retention of a driver - acts that Florida law regards as 'inextricably intertwined' with the use of an auto.") (citations omitted).

fact that methylprednisolone was administered epidurally was what made the use

"off label". **But the Complaint nowhere alleges that Mrs. Artis was injured**

**because of a side effect from off label use. Instead, the Complaint alleges that**

**it was the fact that the epidural steroid injections were contaminated (i.e.,**

**adulterated) that caused Mrs. Artis' injury:**

> J.A. at 69, ¶ 165 ("Mrs. Artis was eventually diagnosed with fungal infection/osteomyelitis (bone infection) **stemming from** *contaminated* **epidural steroid injections** she received from Insight Imaging-Roanoke.")

> J.A. at 70, ¶ 167 ("Mrs. Artis continues effects of her battle with fungal infection, and her infection has not resolved.")

> J.A. at 70, ¶ 168 ("Mrs. Artis' fungal infection was a direct and proximate result of receiving from the defendants *tainted methylprednisolone acetate contaminated with fungus, mold and/or other contaminants, injected into her spinal cavity.*")

> J.A. at 72, ¶ 182, 184 (in support of negligence *per se*) ("Mrs. Artis' fungal infection was the result of the actions of Insight Imaging-Roanoke and its employees and agents in receiving, holding, selling and providing to her an adulterated and falsely represented drug * * * Death or injury of a patient resulting from consumption of or contact with an adulterated and/or falsely represented drugs belongs to the category of harms against which the DCA was designed to protect.")

> J.A. at 77, ¶ 206 ("The negligence of Insight Imaging-Roanoke and its employees and agents proximately caused Mrs. Artis' fungal infection/osteomyelitis.").

The District Court simply erred as a matter of law when it accepted

defendants' invitation to "pick out" two stray negligence allegations, to which no

assertions of damages were attached, as a basis for finding a duty to defend.

45

The same is true with regard to the assertion "pulled out" by defendants from the Complaint alleging failure to obtain informed consent. What do we suppose is the cause of injury when informed consent is not obtained? The injury did not result from some potential side effect of a drug, or complication of surgery, as to which the patient was entitled to know and understand before agreeing to the treatment at hand. **Here, the injury resulted from the use of adulterated steroids -- and presumably the "consent" the Defendants were supposed to have obtained was the consent to utilize medications that were considered adulterated under Virginia law.** Moreover, **had the drugs not been adulterated, no harm could have resulted from the failure to obtain the patient's informed consent.**

The District Court ignored the extensive body of case law holding that **where the injury would not have occurred except as a result of the excluded conduct, the complaint cannot be read to allege a separate, covered claim.** See Superformance Int'l, Inc. v. Hartford Cas. Ins. Co., 332 F.3d 215, 223 (4th Cir. 2003) (Virginia law) ("Superformance also argues that coverage should be provided because the complaints can be construed as alleging claims of product 'disparagement' and 'false advertising,' both of which, it argues, are included in the Hartford policy's definition of 'personal and advertising injury.' We cannot, however, read Ford's complaint to allege disparagement of Ford's products, **except**

**as the result of the alleged dilution of its trademarks**."). See also American Family Mut. Ins. Co. v. Corrigan, 697 N.W.2d 108, 114 (Iowa 2005) ("[T]he bodily injury for which the Corrigans seek compensation from Harold inescapably arises out of Mark's violation of criminal law for which Mark was convicted. Therefore, liability coverage for the claims made against Harold is excluded by the criminal acts exclusion."); Nautilus, supra, 562 F.3d at 821 ("While it is true that the statutory duty of the property owner is independent of the duties of contractors and subcontractors, **there is no separate or independent compensable injury**; a failure to comply gives rise to liability for any property damage "arising from" the excavation. Thus, **the statutory claims in the underlying complaints seek recovery for the same loss as all the other claims — the property damage arising out of the faulty excavation performed by [the insured]'s contracts and subcontractor** — and coverage for that property damage is excluded by the contractor-subcontractor exclusion."); Cincinnati Ins. Co. v. William F. Braun Milk Hauling, Inc., 2013 U.S. Dist. LEXIS 150665, at *8-9 (S.D. Ill. Oct. 21, 2013) ("Specifically, Fasig alleges Braun Milk "fail[ed] to employ the proper number and placement of flagmen for the duration of the oil spill cleanup operation" and "fail[ed] to mark the cleanup area with proper signs and barricades." While these are different theories of recovery, the fact remains that

the bodily injury arose from Braun Milk's use of an automobile which is clearly excluded from coverage.").[10]

Here, the underlying complaints allege only once compensable injury -- illness due to adulterated, fungus-contaminated steroids.   Additional asserted causes of action do not create coverage where they seek recovery for the same injury that is excluded from coverage under the policy.  See Nautilus Ins. Co. v. 1452-4 N. Milwaukee Ave., LLC, 562 F.3d 818, 823 (7th Cir. 2009) (The negligence and *res ipsa* loquitur claims against 1452 LLC also seek recovery for the same injury--property damage arising out of operations performed by 1452 LLC's contractors and subcontractor--and are therefore excluded by the contractor-subcontractor exclusion as well.").  See also Evanston Ins. Co. v. Bulkley, supra, 2005 U.S. Dist. LEXIS 22507, at *16 ("Further evidencing the extent to which Mr. Chisolm's claims of statutory violations are inextricably bound up with his claim of

---

[10]   See also Marvin J. Perry, Inc. v. Hartford Cas. Ins. Co., 412 Fed. Appx. 607, 614 (4th Cir. 2011) (Maryland law) (IP exclusion applies where "**the gravamen**" **of the underlying unfair competition claim "is based upon [the insured's] use of its trade name, trademark, logo, and website** ... in violation of [the underlying plaintiff's] registration and ownership of that name and mark") (emphasis added); Parameter Driven Software, Inc. v. Mass. Bay Ins. Co., 25 F.3d 332, 337 (6th Cir. 1994) (Michigan law) (IP exclusion applies where "[a]ll four counts of [the] complaint," including those for false designation of origin and unfair competition, "**were based upon [the insured's] use of the trademark**"); Clinch v. Generali-U.S. Branch, supra, 954 A.2d at 230 ("He describes no other manner in which he sustained his injuries. Thus, we conclude that the only causes reasonably construed from the plaintiff's complaint, that is to say, that do not unreasonably contort the meaning of the language of the complaint, are for injury arising out of assault and battery.").

intentional infliction of emotional distress, his counts alleging statutory violations of the ADA and of the Rehabilitation Act each assert that the statutory violations caused Mr. Chisolm 'severe' emotional distress."); Prot. Strategies, Inc. v. Starr Indem. & Liab. Co., 2014 U.S. Dist. LEXIS 56652, at *28-29 (E.D. Va. Apr. 23, 2014) ("[E]ven if PSI could demonstrate that there were Claims against any of its other employees, all losses flowing from those claims would be 'in connection with,' 'arising out of,' and 'attributable to' the uncovered Claims—and therefore uncovered themselves . . . .").

**G.    The Fourth Circuit Has Rejected The Argument That The Duty To Defend Is Triggered By Allegations Of Negligence "Picked Out" Of The Complaint, Where Each Cause Of Action Is Predicated On Excluded Conduct, In The Absence Of Which There Would Be No Injury Upon Which To Base An Award Of Damages.**

The Fourth Circuit addressed this very sort of issue in Minnesota Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP, 472 Fed. Appx. 219 (4th Cir. 2012). The argument in favor of coverage was that, notwithstanding a slew of allegations of self-dealing by an attorney, and notwithstanding that the Complaint's entire theory of damages was that the attorney's self-dealing caused his client's loss, there was nevertheless the possibility that the plaintiff might fail to prove self-dealing, but instead might only prove legal malpractice.

The Fourth Circuit would have none of it:

> Perhaps recognizing the weakness of their contention that the BEE does not apply, Appellants offer one other argument. They assert that

even if this exclusion applies to the Ferguson complaint on the whole, because the Ferguson plaintiffs "might prove only the allegations falling within coverage without proving the allegations within the exclusion, the district court should have found a duty to defend." Appellants correctly point out that insurers are required to defend insureds "if any allegations may potentially be covered by the policy." CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009). Under this "potentiality rule," an insurer owes a duty to defend if a complaint "alleges facts and circumstances, some of which would, if proven fall within the risk covered by the policy." Va. Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co., 252 Va. 265, 475 S.E.2d 264, 265 (Va. 1996).

Appellants hypothesize that the Ferguson plaintiffs may prove allegations that trigger coverage, but not the BEE. For example, the Ferguson plaintiffs may prove that Appellants provided professional services by advising their clients how to avoid their creditors, but may fail to show that these services were rendered "in connection with any business enterprise" or resulted "from conflicts of interest." **In essence, Appellants argue that the Ferguson action may amount to merely a claim for legal malpractice. We reject this hypothesis.**

Virginia's potentiality rule requires us to examine the complaint and determine whether any potential judgment under that complaint would fall within the Policy. See CACI Int'l, 566 F.3d at 155. **This process does not disregard the actual allegations that are made.** See, e.g., Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F. Supp. 2d 502, 533 (E.D. Va. 2011) (**refusing insured's attempt to pick out certain allegations because "every claim in the underlying . . . complaint implicates the defective drywall as the basis for the claim**, or the cause of the resulting damages. Thus every claim implicates the Pollution Exclusion.").

In the Ferguson complaint, **each cause of action is premised on an agreement between plaintiffs and Appellants that they would share any WET proceeds**. As both parties acknowledged at oral argument, because the plaintiffs consented to every initial step of Appellants' strategy, **if Appellants had shared the WET proceeds with the Ferguson plaintiffs, there would be no loss for the Ferguson plaintiffs to recover. Without any potential loss, there**

> **can be no duty to defend**. See Va. Elec. & Power, 475 S.E.2d at 265-66 (explaining **insurer has no duty to defend where there is no possibility that insurer will be required to indemnify insured**). Thus because the breach of the agreement is central to any potential recovery, **Appellants cannot obtain a defense by having a court assume plaintiffs will fail to prove the heart of their allegations.** Rather, we must evaluate the Ferguson complaint presuming that plaintiffs will prevail. In doing so, we conclude that MLM has no duty to defend because the BEE applies.

472 Fed. Appx. at 224-25 (emphasis added).[11]

Here, if the only allegation against defendants was their failure to inform plaintiff that the drug was being used "off label" (i.e. simply that methylprednisolone was given epidurally, not that the methylprednisolone was contaminated), there would be no recovery because the Complaint nowhere alleges any harm from such "off label" use. Instead, not only the "heart" but indeed the entirety of the Complaint is based upon and built around the allegation that Mrs. Artis received an adulterated drug in violation of the DCA. Just as the District

---

[11]    See also Cincinnati Ins. Co. v. William F. Braun Milk Hauling, Inc., supra, 2013 U.S. Dist. LEXIS 150665, at *15 (where included and excluded claims are "inextricably intertwined" such that while the complaint asserted more than one theory of recovery, there was only one compensable injury, the insurer had no need to defend or indemnify the insured."); Northbrook Prop. & Cas. Co. v. Transp. Joint Agreement, 194 Ill. 2d 96, 99, 741 N.E.2d 253, 254-55 (Ill. 2000) ("Allegations that the school districts inadequately planned and inspected bus routes or failed to warn bus drivers of potential hazards along the routes are nothing more than rephrasings of the fact that the students' injuries arose from the school districts' use or operation of a motor vehicle. Contrary to the appellate court's holding, the students' complaints failed to allege that the injuries arose from events wholly independent of any negligent operation of the bus. Northbrook therefore has no duty to defend the school districts in the underlying lawsuits.") (internal citation and punctuation omitted).

Court noted in <u>Nationwide Mut. Ins. Co. v. Overlook, LLC</u>, <u>supra</u>, 785 F. Supp. 2d at 534, the plaintiff "has not pled any damages that do not implicate the . . . Exclusion."

As the Fourth Circuit held in <u>Antonelli</u>, the process of applying Virginia's potentiality rule "does not disregard the actual allegations that were made." Defendants' effort to "pick out certain allegations" as somehow falling outside the exclusion fails where "every claim in the underlying complaint implicates [the DCA violations] as the basis for the claim." <u>Antonelli</u>, <u>supra</u>, 472 Fed. Appx. at 224.[12]

The principle enunciated in <u>Antonelli</u> has been followed in the context of claims asserting, as the Artis Complaint does, counts alleging both negligence and negligence *per se*. <u>See</u> <u>Evanston Ins. Co. v. Harbor Walk Dev., LLC</u>, 814 F. Supp. 2d 635, 654 (E.D. Va. 2011), <u>aff'd</u>, <u>Evanston Ins. Co. v. Germano</u>, 514 Fed. Appx. 362 (4th Cir. Mar. 20, 2103) ("The Homeowner Defendants allege the following causes of action against Harbor Walk in the Underlying Lawsuits: negligence, negligence per se, breach of express and/or implied warranties, breach of contract, breach of implied warranty of merchantability, breach of implied warranty of

---

[12]    <u>See</u> <u>also</u> <u>Evanston Ins. Co. v. Bulkley</u>, 2005 U.S. Dist. LEXIS 22507, at *16, n. 2 (D.N.J. Sept. 23, 2005) ("Mr. Chisolm's complaint states as a 'factual allegation' that he was 'ignored, humiliated and treated like a non-person by defendants.' This sentence cannot be wrenched out of context from the complaint as a whole so as to obligate Evanston to tender a defense on behalf of Dr. Bulkley.").

fitness for a particular purpose, private nuisance, unjust enrichment, violation of the Virginia Consumer Protection Act, fraud, and equitable and injunctive relief and medical monitoring. **Each of the aforementioned causes of action implicates the emission of sulfides and noxious gases from the Chinese drywall as either the basis for the claim, or the cause of the resulting damages.** Thus every cause of action falls within the reach of the pollution exclusions, and the Court finds that the pollution exclusions bars all of the claims made by the Homeowner Defendants in the Underlying Lawsuits from coverage under the Evanston Policies.") (emphasis added).

## III. COMPLAINTS ALLEGING BREACH OF WARRANTY AS WELL AS DCA VIOLATIONS ARE ALSO EXCLUDED FROM COVERAGE BY THE WARRANTY EXCLUSION.

The handful of underlying complaints asserting not only DCA violations, but also damages from breaches of warranty are excluded from coverage for the additional reason that damages "arising out of" or "in connection with" breaches of warranties are excluded from coverage under a separate policy exclusion. These complaints also assert negligence; but they do not allege that an act of negligence caused the drugs to become adulterated -- rather they allege the same DCA violations caused the drugs to become adulterated with fungus, and that plaintiffs agreed to be treated with those drugs based on defendants' express and implied

warranties. As such, the negligence allegations included in those complaints are encompassed within both exclusions.

Thus, in the Baker complaint, plaintiff alleges the same DCA violations as in Artis: that the methylprednisolone was represented to be Depo-Medrol, thus fitting one of the definitions of an adulterated drug under the DCA, i.e., a drug that purports to be a drug recognized in an official compendium, but fails to meet the quality or purity standards set forth in the compendium (J.A. at 857, ¶ 37); that this and other violations of the DCA, including ordering medications in bulk, constituted negligence *per se* (J.A. at 860, ¶¶ 61-66); that as a result of the negligence *per se* actions "and violations of Virginia law", plaintiff suffered damages (J.A. at 860, ¶ 68); that defendants were negligent in knowingly purchasing drugs were compounded in bulk in violation of state law, from a compounding pharmacy they knew or should have known did not comply with state law (J.A. at 861, ¶¶ 72-73); that defendants expressly warranted that the drugs were safe and effective and were Depo-Medrol, i.e. a drug that purports to be a drug recognized in an official compendium, but fails to meet the quality or purity standards set forth in the compendium (J.A. at 862, ¶ 89); that defendants impliedly warranted that the drugs were safe (J.A. at 863, ¶ 94); that the drugs were unsafe "as described above" (i.e., because of the DCA violations) (J.A. at

863, ¶ 97); and that defendants were damaged because the adulterated drugs were unsafe (J.A. at 863, ¶ 98).

Essentially, then, every factual allegation and every damage sought in the Baker complaint "arises out of" or is "in connection with" either DCA violations or breaches of warranty, and thus falls within each of these broad exclusions -- alleged negligence in "knowingly" buying steroids in bulk in violation of the DCA is certainly an allegation made "in connection with" violations of the DCA, and is also "in connection with" expressly and impliedly warranting that the steroids were not going to be adulterated and fungus-contaminated. Nowhere does the complaint allege that the plaintiff suffered any damage apart from injury due to receiving an adulterated and fungus-contaminated drug.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons Appellant respectfully requests that this Court reverse the District Court's Order dismissing the Complaint and remand the case for further consideration.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests this Court to hear oral argument in this case because of the significant issues presented by this appeal.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief  complies with the Type-volume limitation of Fed. R. App.
   32(a)(7)(B) because:

   The page count of this brief is <u>13,950 words</u>.

2. This brief complies with the typeface requirements of Fed. R. App. P.
   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced typeface using
   <u>Microsoft Word, Times New Roman, 14 point</u>.

June 17, 2014

                                    */s/ Danny M. Howell*
                                    Danny M. Howell, Esquire

56

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this June 17th, 2014, filed the required copies of the foregoing Opening Brief of Appellant, Medical Mutual Insurance Company of North Carolina, in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Opening Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Frank K. Friedman
Mark D. Loftis
WOODS ROGERS, PLC
Suite 1400, Wells Fargo Tower
10 South Jefferson Street
P.O. Box 14125
Roanoke, Virginia 24038-4125

*Counsel for Appellees*
*Image Guided Pain Management, P.C.,*
*John Milligan Mathias, M.D. and*
*Robert Francis O'Brien, M.D.*

June 17, 2014

*/s/ Danny M. Howell*
Danny M. Howell, Esquire